This is a reprise of an action that was previously here and is back again from the Judgment of the Court of International Trade. Mr. Peterson, you want to reserve three minutes for rebuttal? Yes, Your Honor. Okay, you may proceed. Ready, Your Honors? Yes. Good morning. My name is John Peterson, and I represent Best Key Textiles Co. Ltd. This Administrative Procedure Act challenge to customs revocation of a binding ruling was filed in the United States Court of International Trade. We were seeking APA review, both of the substance of the revocation and the procedure that it was reached by. Why would the CIT need to consider a transfer question if we held it had exclusive jurisdiction pursuant to 1581A? Well, because the Court doesn't have exclusive jurisdiction. In fact, you held that they don't have exclusive jurisdiction over this case. Now, a 1581A case will never give Best Key the relief that it's entitled to under the Administrative Procedure Act. A 1581A case is an action brought by an importer, who in this case would not be our client, it would be their customer, to challenge the assessment of duty. It's a challenge to a different decision on a different standard of review, a different record of review, a different relief. All you can get back in an A case is money refunds. The decision has no res judicata effect. So in effect, if you say you can review this action under 1581A, the answer is you can't. And in fact, the Supreme Court spoke to this years ago. Run that by me again. By whom do you mean, you? I'm sorry. The Court of International Trade in a 1581A case will make a decision about the particular assessment in front of it. It will never make a determination about whether the ruling or the revocation of the ruling was arbitrary, capricious, or legally correct. Right, but that's what we said in the first case. We said you don't have the right to make those alternative arguments. Well, that's a very interesting point, because if that's what the Court is saying, and I don't believe you said that in the first case, what you are saying is that the revocation of a customs ruling under Section 625 of the Tariff Act is not judicially reviewable under the APA. And by no means does this Court's decision last year go that far. And there were some 190,000 published rulings. What we said was your sole remedy was under A, right? You said the sole relief that the Court of International Trade might give in respect to a tariff classification was under A. You did not address the question of whether another court, a district court, might be able to hear this case. Now this is an Administrative Procedure Act case, and district courts certainly hear those. It involves customs duties, which is about as federal a question as you can get, and the district courts do have exclusive jurisdiction over federal questions, except as they may be given to other courts. All that this Court held last year is that this case could not be cabined within the limited subject matter jurisdiction of the Court of International Trade. I re-read the decision this morning, and all this Court talked about was 28 U.S.C. 1581, which is the CIT's subject matter jurisdiction. And you ordered the case dismissed by the Court of International Trade, telling them this doesn't fall within your subject matter jurisdiction. Now the question on appeal here— Well, what we said was it could, if somebody properly filed a 1581A. Well, if somebody filed a 1581A case— People are filing 1581A cases for metallicized yarn. Well, nobody will ever file a 1581A case dealing with the classification of the yarn, because the duty rate for metallized yarn is actually higher than the duty rate for non-metallized yarn, so no one will ever have standing to file that case. The best one could hope for is that one of our customers, who makes garments from the yarn, could import some, pay the duty, and then protest the assessment of that duty. I mean, that gives, best key, no direct relief. That does nothing. Those cases are being filed, are they not? Pardon? Those 1581 cases are being filed. One has been filed, however, even if the plaintiff in that case wins it, it's not going to The Supreme Court spoke to that in the Mead case in 2000. What's the effect of a binding ruling in a 1581A case? And what the Supreme Court said is, well, it's something you could give non-binding skid more deference to, but it is not the decision under review. And even if the plaintiff wins that 1581A case, the ruling stands, and every procedural defect in the ruling stands. And more to the point, in a 1581A case, those are not res judicata. How would your client even have standing to assert a challenge when your client is not importing? Oh, no. Well, you don't have to be an importer to get a customs ruling. Our client is a supplier of a material that importers use. We had standing to get a customs ruling, and one was issued. Based on that, we were able to commercialize our product to customers. Now, when customs revoked that ruling, and the record of the prior case reveals this, our client suffered $200 million in canceled orders. Now that is injury in fact. Wait, but let me just, I guess, ask the, maybe just a slight variant on the standing question Judge O'Malley just asked. You would be sitting pretty, would you not, if the garment classification ruling went the other way, and the rate were reduced from, was it 32 to 5.6 or something? And the current revocation ruling for the yarn remained as is. Lower rates on both scores. You're not hurt by the lower rate in the yarn ruling all by itself at all. Your only harm is that your customers, the garment people, are not going to buy from you if they have to pay, et cetera. Right, but my client's harm was never the harm of paying the customs duty. My client's harm was the inability to commercialize its product, and that is- I guess what I'm confused about is why doesn't all of that point to the idea that the only way you're harmed is through a ruling the garment people can challenge through 1581A? Here's the problem. 1581A decisions are not res judicata. So we could have a client go in with a pair of pants and win. Government could say we're not applying that to anything else. Keep trying, keep trying, keep trying. We would never be able to go to our customers and say if you buy- That's not the norm and you're well aware of that. It's not, excuse me? It's not the norm. When the government brings a specific test case or a party brings a test case and the government agrees to it, if they then in the future try to exclude, the government has to articulate a legitimate basis for that. But there have been cases involving products like tomato sauce where we've seen repeated and repeated challenges. I mean, so you can't guarantee it. And the other fact is that our client is entitled to have a ruling which binds customs officers. Section 502 of the Tariff Act says that an issued ruling binds customs officers to follow it. We had that protection and then we lost it when the ruling was revoked. But the point here involves- What was the story between, if you'll correct me on the dates, between August of 2012 and September of 2013? September 2013, I think, was the revocation ruling for the yarn classification. August of 2012 was the ruling by customs on the garment side, which ended up with the higher, the 32%. Well, it was pretty strange because both rulings came out on the same day. On one day, the government said, oh, this garment has the best key yarn. That's metallized yarn. It gets the lower duty rate. And on the same day, they issued a decision saying best key yarn is not metallized yarn. What that meant is when the best key ruling became effective 60 days after that, the garment ruling became ineffective as well, became ineffective. So that's really the problem. The problem here, and the government has a memo in the record of the first case saying, oh, if we lose this case, the government could lose up to $2 billion a year in duty collections. They're going to fight hard. We have to fight them piecemeal in eight cases. We're never going to get anywhere. But the point here is that the APA gives us a right to judicial review of the revocation of a ruling quite apart from the right of our individual customers to fight for a customs duty individually on a shipment. So I don't know as much about how this works as some others here do. So let me just ask you this and tell me if there's something off about the question. Suppose you got the revocation ruling for the yarn classification changed. And so at that point, if you imported yarn, you'd have to pay 13% higher duty, pay a higher duty. What and that was the only change in current customs practice. What would happen when your customers, the shirt makers, the garment makers, import goods? What are the customs officers going to do at the shipping? Well, look, if we have a binding ruling in effect that this is— As to the yarn, but not as to the— Yeah, if we have a binding ruling in effect that the yarn is a metallized yarn and one of our customers imports a product made from that yarn and is assessed with duty at a higher They have, in addition to whatever classification remedy they would have under 1581A, they would also have the additional ground of saying that this determination is in contravention of the rule. And under Section 502 of the Tariff Act, the ruling governs, you know, binds the action of the customs officer. So it would give both us and our clients a great deal more assurance. Now— But then would that not have to be litigated under 1581A unless customs said, oh, right, well, change. There was a case in the court a couple of years ago, International Custom Products versus United States, where that exactly happened. Judge Carman in the Court of International Trade ruled in favor of the plaintiff and said, I'm not going to decide what the classification of product is. I'm just going to decide that you had a ruling. The ruling was not followed. And on that basis, the duty assessment against you is improper. But that's different than a change in the ruling. Yeah, yes. But, Your Honor, see, we're not here to re-argue the best key one. I accept that the court said the CIT lacked subject matter jurisdiction. The question here is, when the mandate went down to the court and we asked the court to transfer it to district court, they refused. They said, we're not going to consider that. Saying there was a mandate. Well, this is the thing. The government says that the court applied the mandate rule, but they didn't apply the mandate rule. The transfer statute says the court has an obligation to consider transfer. The court considered it in the alternative. Even if I could consider it, I wouldn't transfer it. But the question here was, did this court's decision last year preclude the issue of transfer? It didn't. Well, tell me what's wrong with the following way of thinking about it. In determining whether the mandate rules, the vertical mandate rule applies, we looked, we said, at the letter and the spirit. The letter was dismiss. Dismiss is inconsistent with transfer. Then you look at the spirit. Now, on the one hand, you might say transfer just wasn't presented to us, and so we didn't really talk about it, and maybe it's outside the spirit. But on the other hand, a large part of the spirit of the ruling is there is an exclusive way to get the dispute resolved, and it's through 1581A. And where 1581A applies, it is, by its terms, exclusive. So why isn't giving the letter of the ruling, dismiss, its plain meaning, in fact, supported by the spirit? As I said, Your Honor, 1581A does not solve this dispute. If we're going to apply the mandate rule, you have to make a contextual examination of what this court did last year, and the CIT refused. If this court had said— You knew last year what the court did when you got the ruling. If you thought that it didn't mean what you wanted, why didn't you request a rehearing of the panel? We didn't request a rehearing. We have filed a provisional request, a provisional motion to recall the mandate there. If this court feels that it needed to be the one to consider transfer— Did you file a rehearing petition under the usual rehearing rule within 14 days? No, because I did not want the court to rehear the question of jurisdiction. I accept them saying the CIT doesn't have jurisdiction. No, no, no, no, no. Did you ask for clarification before the mandate issue? No, but we're not required to. We can ask the lower court to transfer. See, if this court had dismissed saying there's a failure to state a claim, then if you use the mandate rule, the lower court would say, well, I'm not going to transfer this because the question of transfer is precluded. You don't have a claim. To transfer would be to encourage foreign shopping and relitigation, which can't be done. The only thing that happened here is this court said, CIT, you don't have jurisdiction over this case under your limited grant of jurisdiction, period, the end. No, but that is not the only thing that happened.  That's right, but that does not preclude the lower court when it's dismissed for lack of jurisdiction from considering the question of transfer. Transfer only becomes material when the court is told or concludes it lacks subject matter jurisdiction. You've used all your rebuttal time. We'll give you two minutes for rebuttal. Thank you, Your Honor. Good morning, Your Honors. Beverly Farrell from the United States. Your Honors, as you've been discussing with Besky, the problem here is that it was dismissed for a lack of jurisdiction. In reading this court's opinion, when one looks at that jurisdiction, what jurisdiction are we really talking about here? We're actually talking, it's subject matter jurisdiction, but we're really talking about the CIT would have had jurisdiction had there been a harm. So you see, really, the jurisdiction spins on, had there been a harm to Besky in the yard ruling. A jurisdiction could have been alleged. Yes, Your Honor, because, and this goes back to, this case is about a yarn ruling. There's absolutely no harm when you reduce the tariff rate. If I'm importing into the United States and I get a lower rate, I'm not harmed. So when Besky came to the CIT, there was no jurisdiction because it hadn't been harmed. In other words, there was no Article III jurisdiction. There was no case or controversy. So when this court says to the CIT, oh, you dismissed because there's no subject matter jurisdiction, it's because, really, there's no Article III jurisdiction. And if there's no Article III jurisdiction, that's for every federal court in the United States, not just the CIT. But this court recognized that this is a subject matter had there been harm that would have been exclusively the domain of the CIT, but there wasn't harm. So how could you transfer this to the District of Columbia? You can't. There's no Article III standing. So inherent in this court's opinion, when it says, oh, there is, see, the true nature of Besky's case isn't that it's upset about a reduction in the yarn's duty because it wasn't going to import it anyway. That was a pretext. That was a pretext because we're going to try to piggyback on a decision from customs. This case has always been about the garments. And this court said that specifically. It said, you know, this is really easy. Just bring a 1581A action. Because if your harm is occurring overseas because overseas manufacturers who make things out of your yarn won't get a good duty rate in the United States, well, until you get into the United States and get the bad duty rate, then you bring a 1581A action. This is the sum and substance of the harm that Besky is really trying to argue about. So there is no standing for Besky. In any court in the United States of America, because it doesn't have Article III standing. That's where the lack of subject matter jurisdiction is. And I think, Your Honors, this morning as you're discussing this case, that is where this is driving. But even if it's not an article, even if it's a subject. But can I just ask, can you point me toward, in the earlier ruling, our 2015 ruling, to what passages say there's no Article III jurisdiction here? Because there's no case of controversy. Your Honors, I don't believe this court ever articulated it that way. No. But what it did articulate was that you had no harm. That Besky's harm. See, this case, Besky's case is limited by the issuance of a pre-importation norm ruling, which was subsequently revoked. Right. But I guess I'm pausing. The proposition that if you put the statutes, 1581, out of the picture, the idea that there would be no injury, in fact, traceable to the ruling, that there would be, I guess I'm, I would pause before I would conclude that there is no Article III case of controversy over that. If they come in and say, I just lost $200 million in orders because of this, as opposed to that's something that they can get relief for somewhere else, or that somebody can get relief for somewhere else. But Article III? Yes, Your Honor. Because when they complain that they've lost, allegedly, because these were contemplative, according to your opinion, before these orders were alleged, they were contemplative orders, but not that they'd actually, there was never a contract, you know, put before the court saying, yes, we actually have an order that was revoked. Okay. There's no, there's nothing in the factual record that ever indicated that there was a signed, sealed, and delivered contract. In fact, when Besky seeks a yarn ruling, gets it, and then subsequently follows with a garment ruling request on the Johnny Collar, when it does that, it suggests that if there are any contracts, that they're contingent that the garment is going to be classified in the tariff rate, not as a polyester garment, which will come in at 32%. So those contracts, just from the context clues, again, we don't have anything in the factual record, not in the case before, and not in this case, that there were ever any contracts. There may have been contingent contracts based on that Johnny Collar ruling, but again, it goes right to what this court said. In fact, we have, in the record from the last case, an admission that there was never any intention of importing yarn, right? That's right, Your Honor. And that there was no definable contract that they could point to. That's right, Your Honor. That actually is in the prior record. In the prior record, yes. So there's nothing in the, but that's the point. There's nothing in the record that there were ever contracts where there were losses. When Besky comes to the Customs first for a protectural yarn ruling, and then wants to bootstrap a garment ruling on top of that, because, see, it's economically irrational to come to Customs, okay, seeking a yarn ruling and saying, hi, we'd like to pay a higher duty. So the assumption has to be that, well, maybe it is metalized yarn. Maybe nothing gets done, and you just agree with what the petitioner is seeking, because no one would do something economically irrational. But then the garment ruling comes in, and you understand that there is no economic irrationality. There's a bootstrapping effect that's going to occur here, because there was never an intention. There was never an intention to import yarn into the United States. It was unfair to ask Customs to issue a yarn ruling in the first instance, when you knew full well you were never, ever, any day in your life going to import yarn into this country. Maybe those, maybe it shouldn't be revoked. Maybe they should be void ab initio. Maybe the yarn ruling, which was nothing but a pretext, should be void ab initio. Because really, the substance of this case, the heart of this case, is the garment. So when you say- Do you have to have an intention, I mean, put aside Article III jurisdictions, do you have to have an intention to import, to seek a ruling? Yes. Because you have to, under CFR 177.1 and .2, when a person is seeking a pre-importation ruling letter, it has to be for a specific transaction. They have to say, they even tell you what port they're going to be bringing it in. You have to say what port you intend. Now, it could happen that you don't do it. Okay, something could happen, you know, the world changes and it doesn't come to pass. But if you're never going to import yarn, which it appears to be the case here, because the record reflects that, that Beskey never had an intention to import yarn into the United States. Beskey always had an intention to sell yarn to foreigners who would make garments that would eventually end up in the United States. That's really what the nub of this case is. And therefore, the nub of the case is garments. It's always been garments. It's not yarn. So when that yarn ruling comes out and then it gets revoked and then the duty drops, you don't have a harm for the thing that you were actually asking for, which was a pre-importation ruling regarding yarn. All this other stuff is a sideshow. It's a sideshow that occurs overseas. It's not cognizable. This is not cognizable harm. Contracts, even if there were contracts that then went out of being, those are not cognizable harms for pre-importation ruling with respect to yarn. You should get a pre-importation ruling with respect to a garment, which they did. And what did they do with that ruling? Nothing. And by the way, that ruling was always at 32%. The Johnny Collar ruling, when it was first issued, said, no, it's not something that would fall in with metallized yarn. It's a polyester shirt. That yarn ruling came in that way. That's how Customs classified it. In doing so, Customs realized that there was a problem with the yarn ruling, because now it knows that this other one is a little bit pretextual. When they revoke both, they have to correct. They have to revoke the Johnny Collar so they can correct the entire record. When the Johnny Collar ruling gets reissued after the revocation, it's the same ruling. It's the same classification. It's a polyester shirt at 32%. So just bring that action, which of course, as your honors know from our footnote in our brief, it has been brought as lockwork textile in the CIT. So someone will hear- I looked at that case. I looked at it. So it's a case that's based on metallized yarn, and it's women's slacks. That case is now going to be heard by the CIT eventually. I mean, there may be a jurisdictional kind of scrabble going on there. Not the type of jurisdictional scrabble that's going on. Maybe a jurisdictional scrabble. You've heard tell. Well, I'll be honest. There is a jurisdictional scrabble occurring in that case, but not of the sort that occurs here. But fundamentally, the yarn ruling being protectoral, you end up with the revocation leading to no harm. So there's no harm there. So there's no Article III standing. But then the question becomes, do contracts overseas have anything to do with the yarn ruling? Is it possible to argue that a yarn ruling, that yarn being imported into the United States has anything to do with overseas contracts? Those contracts could have continued, couldn't they? Maybe they want to import them into a different country, not the U.S. You're getting down a road of a lot of specific factual findings that the CIT has never made. Right, right. I mean, should we remand for the CIT to make these factual findings? No, Your Honor, because there isn't any jurisdiction. So with the CIT, this case was remanded for lack of jurisdiction. So whether it's lack of jurisdiction because fundamentally there's no harm to Besky, which is the true nature. It's brought under your eye, which says it can't exist if there's other jurisdiction. Correct. If the harm that you're, you know, and again, this Court recognized that indeed designed the roadmap for Besky, that if really the harm you're complaining about, the nub of that harm is something else, it's the garment. That's really the issue. If the garment manufacturers can see that their garment's made of this yarn, however that yarn is classified, if their garments are going to come in and they're going to be classified in this heading, then they're going to proceed. They're smart business people. They don't want to come in at 32%. They don't want to come in at 32%. If we want to consider in the first instance the propriety of transfer, do we have to conclude that there would be no Article III jurisdiction in the district court? Or is there a broader basis upon which we could say that justice doesn't support the transfer? Yes, Your Honor. There's two. I believe the Article III is more than sufficient. But there's also what has been articulated in the opinion of this Court before in Besky, which is really the nature of the case that you're bringing, Besky, is the garment case. That's what you're really complaining about, that someone doesn't want to bring garments into the U.S. You're trying to kind of, you know, effectuate somebody else's rights. Now, could Besky import a garment and bring this case? Yes, of course they could. They could import one garment and bring this case themselves if they so chose. Not this case? Not this case. No, I'm saying— It would be a challenge to Johnny, whatever. Right. To the extent—exactly. It's a challenge to the Johnny Collar case. I mean, that's been sitting out there for years. That was a plumb if one wanted to bring a case to really hear the 1581A and the garment proper classification. But what you have here is, you know, there are times when something won't be heard. And this is that type of a case. The yarn revocation ruling, you got your proper 1625C, had your notice in common. That was proper. So we didn't have an improper process that was designed when there's going to be a revocation of a ruling that you receive. So customs went through the proper process. So now the outcome is, hey, you benefited from it. Even if the process was slightly—if it were slightly imperfect, which there's nothing in the record that it was. But even if there were, okay, you benefited. So you have no harm. See, that's the problem for Besky. And again, it goes back to 1581A. So, Your Honor, you ask, is there another way we can come at this that we don't need to transfer? Well, yes, because fundamentally, the nature of this case is a 1581A action on a garment. That is the true fundamental nature. Because no one's importing Besky's yarn into the United States. And this case was predicated on the revocation of the yarn ruling, which is a very narrow area. And that narrow area rendered no harm to Besky. In fact, it was a benefit to Besky when it reduced the rate of duty on the yarn. The other thing, Your Honor, is with respect to the mandate, when this court dismissed with instructions to the trial court to dismiss for lack of jurisdiction—when this court remanded, excuse me, with instructions to dismiss for lack of jurisdiction—it was this court that found a lack of jurisdiction. Therefore, it's only this court that could actually say that transfer is required or should be considered. The trial court can't do it. The trial court's hands are tied because it was not the court under 1631. If you read 1631, the plain language is, the court that concludes that there's no jurisdiction shall consider whether or not to transfer. The trial court here couldn't have been the court that decided there was no jurisdiction. It was on the receiving end of this court's determination of no jurisdiction. So this court could have said in its ruling, oh, and by the way, trial court, why don't you consider whether or not this case ought to be transferred? And this court also notes, because we had a motion to recall the mandate, this court recognizes, well, if the one thing that's been consistent from the government in this That has been our song from the beginning. There's never been jurisdiction. We got it right the first time, and then the trial court, on a reconsideration, found jurisdiction, kind of an assumption of jurisdiction. But that lack of jurisdiction, you know, this court has that ability to transfer. So you can't ask the trial court to do it. The proper methodology here should have been, knowing full well the government has been dogging the issue of jurisdiction, that as soon as this court's decision came out, the first paragraph told you what the outcome was. It's going to get dismissed for lack of jurisdiction. Well, then I should ask for a transfer. I did it when I was in the trial court. I asked for a transfer in the trial court. There were multiple times, at oral argument, in a reply brief, in a motion for reconsideration, before this court ever gets to issuing its mandate. Got it. Thank you, Your Honors. Talk fast, if you want to catch up, Mr. Peterson. Well, Your Honor, thank you for giving me two minutes. I'm going to use them to make two points. First, we have Article III standing. We have injury, in fact. We lost over $200 million in business out of the chute. Now, that is exactly the kind of standing that a district court would accept under the APA. Let's suppose that my client made a chemical component that was used in a pesticide. Under the APA, if I'm remembering some older Supreme Court law, APA imposes a higher than injury, in fact, requirement. There's this whole zone of interest requirement, which has had different names. But it basically says, is this statute one that is supposed to protect you, even if you have injury, in fact? So why would that not be a, that is to say, translate everything that we said in the last opinion into, and all this discussion here says, your harm is only indirect. It comes from garment rulings. That belongs to somebody else. Extensively litigated below, Your Honor, the zone of interest test applies when you're not the person who was the recipient of the administrative action, but you are affected by it. We are the person who's affected. Besky, we're the ones who had the ruling. You're benefited by the ruling you're challenging. I did not. I mean, let's suppose that I was, to go back to the example I was going to before, suppose I made a chemical component, which the EPA said is approved for use in pesticides. And then the EPA says, it's no longer approved for use in pesticides. Now, would the government say, oh, Mr. Component Maker, you can't bring a case against the EPA. You don't have any standing. You don't have any injury. Only the guys who have the pesticides would have the injury. And the courts have never agreed with that. That Component Maker would have standing. That's a false analogy. Huh? That's a false analogy. No, it's not because what we're looking for is declaratory relief, which we get under the EPA, not money relief, which the CIT gets. But here's the second point. This is really important. Suppose the duty rate in this ruling had been a higher rate. Ms. Farrell would have been here arguing the same thing. She would have said, oh, you can't bring a case to challenge the ruling. All you could do is bring cases when you pay the higher duty and try to get your money back. Bring a 1581A case. So whether the duty rate went higher or lower is really not material to what the government's saying. What the government is saying is this. They're saying a customs ruling revocation is not judicially reviewable under the EPA on its own merits. Now, if that's the case, they're going to write Section 502 of the Tariff Act right out of the act. Rulings are no longer binding. They mean nothing. We can derogate from them. They're going to write Section 625C out of the act. That's where this case comes from. 20 years ago, Congress said before you get rid of a customs ruling, you need notice, comment, publication. So if there's no standing, if there's no justiciability for the issuance or the revocation of a customs ruling, if I can never enforce Section 502 and I can never enforce Section 625, then you have just announced a range of non-reviewable administrative actions of which there are 190,000 out there right now. I think if this case is transferred to the district court, they'll have to make original determinations about plausibility. They'll have to make original determinations about whether we have injury in fact. That's what this court should do. I don't know what the district court will do, but I do know that this court probably doesn't want to hold that a whole range of customs law jurisprudence is not judicially reviewable. So take that back to the chambers with you. You're way past your time, Mr. Peterson, but I want to finish my sentence from when you interrupted me. I apologize, Your Honor. Well, you should apologize, Mr. Peterson, but you do interrupt. I was at the point of saying that's a false analogy if you, and you said, the transcript will show, no it isn't, and then took off. And so I'm going to finish that sentence, and that is, if you want to make a correct analogy, you would say that the EPA approved a chemical for pesticides, and then, rather than revoking it, said, oh, and by the way, it's also good for medical treatments. And I finished my sentence, and you don't have any time to respond. Thank you, Your Honor. Because you interrupted me early. All right. Apologies again. The case will be submitted. We'll move on.